**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-CR-80093-MIDDLEBROOKS**

**UNITED STATES OF AMERICA**

**v.**

**JASEN BUTLER**

$\qquad$ **Defendant.**

_____/

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

In just 18 months, Jasen Butler stole more than $4.5 million dollars from the United States military through a brazen fraud scheme. He forged dozens of invoices for phony expenses, he impersonated a fuel trader in England in a sham email, he lied to his own accountant to falsify his tax returns, and—once his scheme began to unravel—he assumed a false name and fictitious role at a friend's company to evade detection. Because of this, the jury swiftly convicted Butler of 34 felonies: wire fraud, forgery, and money laundering. Although this is the first time that Jasen Butler will be held accountable for his crimes, this was not Butler's first time breaking the law. Nor is it likely to be his last. To date, Butler has shown no remorse. He continues to claim that he was entitled to millions of dollars that he stole from the government.

In light of the Section 3553(a) factors, in particular Butler's high likelihood of recidivism and the need to protect the public, a sentence of 71 months—the top of the Sentencing Guidelines range—is sufficient but not greater than necessary to accomplish the goals of sentencing. The Government also seeks a within-Guidelines fine and a preliminary order of forfeiture, *see* Dkt. 145, and requests a restitution hearing within ninety days to prove the full amount of the loss Butler inflicted on the military.

**BACKGROUND**

1.  Procedural Background

On June 11, 2025, a Grand Jury in the Southern District of Florida returned a 35-count Indictment charging Defendant Jasen Butler with Wire Fraud (18 U.S.C. § 1343, Counts 1 through 27), Forgery (18 U.S.C. § 495, Counts 28 through 33), and Money Laundering (18 U.S.C. § 1957a, Counts 34 and 35). The Grand Jury alleged that, between August 2022 and January 2024, Butler created and submitted 27 fake documents to the military for reimbursement, defrauded the military of over $4.5 million, and laundered the proceeds into two luxury homes. The case proceeded to trial on January 12, 2026. Following a three-day trial, the jury found Butler guilty on Counts 1 through 33 and Count 35. On March 26, 2026, the United States filed a motion seeking a preliminary order of forfeiture against property traceable to Butler's crimes and a money judgment in the amount of $4,528,827.71—the amount of Butler's gain proven at trial.

2.  Factual Background

Jasen Butler had a fuel business—Independent Marine Oil Services—and bid on contracts to supply fuel to military ships through an online system called SEA Card. He would contract with Integr8 Fuels, a global fuel broker, to supply fuel to military vessels all over the world.

When the Navy or Coast Guard cancelled a contract, it was their policy to make fuel merchants whole. Suppliers would charge cancellation fees to merchants like Butler. The military would then reimburse the merchants for those cancellation fees. Typically, the military would ask merchants to provide proof of what the supplier had charged them before authorizing reimbursement.

Between August 2022 and January 2024, Butler created and submitted at least 27 false documents to the military to substantiate more than $4.5 million in phony charges for which he

2

billed the military. Butler's scheme was calculated and premeditated. He laid the groundwork for his submission of false invoices at the outset of the contracting process by falsely stating, in the SEA Card system's bid comments, that he had to pay his supplier in advance for fuel and could not recover those funds in the event of changes or cancellations:

> **We are having to buy fuel post confirmation and do not have the option to return product.** The fuel order must be paid for regardless if the fuel is loaded in the truck or taken by the ship. This is non-negotiable. Once the nomination is confirmed, it cannot be cancelled. **Refinery penalty charges are the total full cost of the product** and will have to be paid even in case of Cancelation.

GX 4002, *passim* (emphasis added). Although Butler wrote these false warnings in the bid comments, he typically put a number substantially less than the full cost of the fuel in the box on the portal where he was instructed to write the "estimated cancellation fee." *See, e.g.*, Trial Transcript (TT) Jan 13 at 112 (testimony of Director Jamaal Rose) ("I would look at [the number in the cancellation box] and expect the cancellation fee to be 15,000."). When orders were cancelled, Butler would point to this language in the bid comments in order to argue to the military that he had warned them that he would be on the hook for the full cost of the order in the event of cancellation.

Butler's scheme to defraud the United States Armed Forces attracted scrutiny from the Navy after he submitted a falsified invoice for $557,265 related to an order in Split, Croatia in July 2023. The order was awarded to Butler's business on July 10, 2023, and cancelled two hours later. Based on industry norms, there should have been only a minimal cancellation fee. Integr8 charged Butler $3,000 for the cancellation. Although Butler falsely claimed to the military that Integr8 had charged him $557,265 for the order, on the other side Butler disputed the true $3,000 fee as unreasonable and refused to pay Integr8. *See* GX 2104.

On July 20, Butler wrote to the Defense Logistics Agency: "I'm [sic] know I'm under a bit of scrutiny recently for the ancillary charges." GX 3600. He offered to provide "whatever proof

NAVY needs please just let me know." *Id.* And he insisted: "It's a large amount of money (As you know) that I have already sent out. I can't float this forever." *Id.*  On September 12, 2023, the Defense Logistics Agency rejected the claim for the Split order, writing to Butler: "Upon DLA Energy's review of the substantiating document provided, Independent Marine was unable to provide substantiating documentation proving its supplier incurred costs between the time of award and its cancellation two hours later." GX 2109. Butler agreed to withdraw the claim. *Id.*

Due to these events, Butler arranged to bid on military contracts under a false identity. By August 2023, Butler was having discussions with his friend Richard Eten about working with Eten on expanding Eten's disaster cleanup business, Patriot Disaster Specialist, into government fuel contracts. Butler told Eten that he could no longer fuel government vessels because Butler had been fueling them as a sole supplier, and the government disfavored sole supplier contracts. *See* TT. Jan 14 at 34. Eten assigned Holly Owens, an independent contractor working for him on government contracting, to bid on fuel contracts with Butler. *Id.* Butler, Eten, and Owens agreed to split the profits three ways. TT. Jan 14 at 36.  This eventually turned into a 50-50 split between Eten and Butler, with Owens's consent. *Id.*

On September 21, 2023, Butler requested a Patriot Disaster phone number that would forward to his phone but not show up with his name when he placed a call. GX 3615. He also used a Patriot Disaster email address: marinegroup@patriotdisaster.com. *See* TT. Jan 14 at 38-39. Butler set the signature block on this email address to use the name "Adam Ogden." (The real Adam Ogden was a high school classmate of Butler's at Jupiter High School. *See* Attachment 1 (Jupiter High School Yearbook)). The rest of the signature block identified Ogden as the "Head Bunker Trader" at "Patriot Disaster Global Supply." GX 2607.

Butler continued to bid on contracts as Adam Ogden and submit false documents for reimbursement. Butler told Eten that he made his profits by betting that orders would be cancelled. TT. Jan 14 at 36. But he hid from both Eten and Owens the fact that he was submitting false invoices to the military. TT. Jan 14 at 50-51. Over the course of their business arrangement, Butler told Eten and Owens that they were making hardly any profit. Although millions of dollars were passing through the Patriot Disaster bank account, Butler falsely told Eten that his supplier costs had eaten up all but $42,000 of the money Patriot Disaster received from the military. When Eten and Owens asked for proof of payment, Butler created two more false Integr8 invoices and sent them to Eten and Owens. *See, e.g.,* GX 3830 at 4.

Eten wired Butler all the money he received except for around $21,000. But he found Butler's explanations of his operating expenses hard to credit and the two broke off their business arrangement in January 2024. Eten and Butler remained friends and continued to take fishing trips together for another year and a half, until, during its investigation, the Government showed Eten real Integr8 invoices that established that Butler had provided him with false invoices and misled him about the true profit margin. TT. Jan 14 at 65.

Butler told an imaginative array of lies to advance his scheme to defraud the military. He blamed his own suppliers for charging high cancellation fees and pretended to agree with government officials that the charges were outrageous. GX 504 ("I think it's outlandish to say the least that the supplier would even consider the full amount. That being said... OmanOil has considered their position and decided to be assholes about it … I'm legit unhappy/ displeased/ angered that they are charging this much but they are unwilling to waver."). He invented a range of fees that his suppliers had to pay in the event of cancellation and suggested (both implausibly and falsely) that fuel not taken on time would need to be "sludged." GX 1306. He even fabricated

an email that he attributed to Giuseppe Azenna, an oil trader at Integr8's office in England. GX 504; *cf*. GX 505 (unaltered email from Azenna to Butler). Butler insisted that he had bargained with suppliers and saved the government money. GX 2608. And he would regularly chide the military that its delays in reimbursing him for his fake invoices were putting his business in jeopardy. *See, e.g.,* GX 3600.

In reality, Butler was stealing millions. In just the year and a half period charged in the Indictment, Butler reaped at least $4.5 million from his scheme. GX 4012. He spent profits from the scheme on the purchase of a $1.3 million home in Florida and a $2.1 million home in Colorado, both of which he paid for in all-cash transactions. *See* Dkt. 145.

3.   Probation's Presentence Investigation and the Defendant's History

Probation Officer Nicole Garcia conducted a presentence investigation and filed the Draft Presentence Investigation Report on March 3, 2026. Dkt. 141. As set forth in the report, on October 12, 2006, Butler enlisted in the United States Marine Corps. He was discharged in an "entry level separation" two months later, on December 12, 2006, after the Marine Corps determined that he suffered from a "personality disorder." PSI ¶ 110.

Butler formed the company Intrepid Oceans Marine in December 2013 to bid on government fuel contracts and signed a merchant agreement giving him access to the SEA Card system. *See* PSI ¶¶ 51, 119. In September 2014, DLA initiated debarment proceedings against Butler and Intrepid Oceans Marine (as well as against Butler's father, James Butler, and another of Butler's fuel businesses, Independent Marine Oil Services). PSI ¶ 48. DLA's debarment memorandum cited Butler's attempts to convince DLA—and military personnel aboard individual vessels—to improperly award him sole source contracts and to avoid payment through the SEA Card system to eliminate the transaction fee. PSI ¶¶ 51-53. Butler had contacted a competitor,

Merlin Petroleum, to propose that they "stop fighting over the same orders, and instead [work] together to increase the profits [sic] margin for both of us." PSI ¶ 54. There was also an incident in May 2014, in which Butler told a series of lies on a call to the US Coast Guard Station at Portsmouth Harbor in an attempt to get them to disclose commercially sensitive information about "the types of fuel they currently purchase[d], their tank capabilities, and their current suppliers." Attachment 2 at 3.

Butler responded in writing in November 2014 and made an in-person presentation to DLA in December 2014. Butler offered a somewhat technical defense to the collusion charge, and concluded:

> I hate trying to dissect the definition [of collusion] to find a way that what I did was not wrong because it makes it seem like I was purposely and knowingly walking a thin line hoping to find a loophole. This was not the case. I had an idea, which I thought at the time was a good idea. I never thought it was illegal, nor would I have even considered it if I had known. **I pride myself on being an honest person, and thought my idea was legitimate. I have since learned, and will not repeat these errors.** I will not risk losing my ability to work with the DLA again.

PSI ¶ 58 (emphasis added). Butler admitted that he may have committed wrongdoing accidentally, but argued that he did not understand the rules because he was new to the industry. He offered to "implement any measures" DLA proposed and claimed to have "instituted a system of checks to make sure that I do not make these same mistakes again." Attachment 3 at 6. He also made the following proposal:

> I would gladly receive ethics training to improve my standing with the DLA. While I do not agree that my mistakes were on purpose, and thus no lack of ethics is the case, I would still be willing to become more aware of accepted practices.

*Id.* Butler concluded:

> I feel like I have provided enough evidence to each allegation to show that **I'm not the lying, backstabbing businessman my competitors would lead you to believe.** I'm just a guy trying to make an honest living, and in doing so have

7

made errors, but **I have since learned from these errors and can promise smooth sailing if given another chance.**

*Id.* at 7 (emphasis added). Subsequent events have cast doubt on Butler's sincerity in making these promises.

On February 27, 2015, DLA sent Butler a letter terminating the proposed debarment: "In view of the December 2, 2014 presentations made by you and your willingness to take corrective and remedial actions, I have concluded that continued ineligibility for Government contracts is not necessary." Attachment 4.

By the summer of 2017—barely eighteen months later—Butler had begun submitting false invoices to the military for reimbursement. PSI ¶ 60. Butler continued this fraud scheme through January 2024.

As noted in the PSI, Butler has no criminal convictions on his permanent record. However, this is not his first run-in with the law. In 2006, Butler pled guilty to possession of a firearm in a wildlife environmental area during closed season. PSI ¶ 82. Adjudication was withheld. *Id.* In 2020, Butler pled no contest to entering a Florida wildlife environmental area without a permit. PSI ¶ 83. Adjudication was withheld. *Id.* And in 2023, Butler pled guilty to reckless driving for fleeing the police by driving 80 mph in a 30-mph zone, running stop signs and improperly passing several vehicles. PSI ¶ 84. Adjudication was withheld for this charge as well. *Id.*

One additional episode, taking place less than three weeks after Butler's June 11, 2025 indictment in this case, is worth noting. Butler operates a fuel barge, the Pickle Rick, for fueling private vessels. On June 30, 2025, a Coast Guard official, Chief Warrant Officer Mark Senna, asked Butler to show him documentation of a pre-fueling safety inspection for fueling a large yacht earlier that month, on June 4. *See* Attachment 5. Butler told CWO Senna that he had filled out the documentation before the June 4 transfer, but had left it in his office. This was a lie; no such

documentation existed. Since Butler was fueling the same yacht the next day, July 1, he had an employee tell the chief engineer to sign two copies of the paperwork, one in black ink and one in blue. Butler backdated one of the forms to June 4 and sent both forms to CWO Senna. *See* Attachment 6. Butler's submission of a false document to the Coast Guard—and some other irregularities with the fueling—were quickly discovered after Senna contacted the yacht's chief engineer. *See* Attachment 7. As a result of this incident, the Coast Guard suspended Butler's license to operate the Pickle Rick as an inspected tank barge. *See* Attachment 8.

4.  PSI Guidelines Calculations

The PSI calculated the Guidelines as follows: Counts 1 through 27 and Counts 28 through 33 are calculated under § 2B1.1. Count 35 is calculated under § 2S1.1. Because the harm in this case is aggregate harm (the greater of the actual or intended monetary loss), Counts 1 through 33 group pursuant to U.S.S.G. § 3D1.2(d). They are then grouped with Count 35, which is a specific offense that adjusts the guidelines applicable to other counts. PSI ¶ 70. Pursuant to U.S.S.G. § 3D1.3(a), the offense level for the group is the highest offense level of the counts in the group. In this case, § 2B1.1 and § 2S1.1 produced the same offense level. PSI ¶ 71.

Under § 2S1.1, the offense level for the underlying offense is based on the most serious offense or group of offenses, which means that the base offense level is calculated under § 2B1.1. PSI ¶ 72. Under § 2B1.1(a)(2) the base offense level is six. The PSI calculated the intended loss figure as $5,086,092.71, putting the loss amount in the $3.5 million to $9.5 million range, which increases the offense level by 18. *Id.* There is an additional two-point increase for Butler's sophisticated means. *Id.* This results in an underlying offense level of 26. *Id.*

The offense level is then increased by 1 point because of a conviction under 18 U.S.C. § 1957, per U.S.S.G. § 2S1.1(b)(2)(A). PSI ¶ 73. The report calculates a Criminal History

of 0, so Butler receives a two-level adjustment as a zero-point offender under § 4C1.1(a) and (b). PSI ¶ 79.

The result is a total offense level of 25. PSI ¶ 80. Combined with a Category I criminal history, this yields a Guidelines Range of 57-71 months incarceration and a recommended fine between $20,000 and $200,000. PSI ¶ 158. The PSI notes that Butler is a multi-millionaire with the financial means to pay a court-ordered fine. PSI ¶¶ 126, 146.

ARGUMENT

## I.      The PSI's Guidelines Calculations are Correct.

The Government agrees with Probation's calculation of the Sentencing Guidelines. Butler objects to two aspects of the PSI's Guidelines calculation—the loss amount and the sophisticated means enhancement. *See* Dkt. 144. The PSI is correct on both points.

1.   <u>The PSI Correctly Applied an 18-Level Increase for a Loss Amount between $3.5 Million and $9.5 Million.</u>

The PSI is correct that the loss amount is between $3.5 million and $9.5 million, increasing the offense level by 18. PSI ¶ 72. At trial, the evidence established that by submitting falsely inflated invoices Butler received $4,528,827 more than he otherwise would have. *See* GX 4011, 4012. Butler caused the military to lose more than he personally gained, because the military paid out a 2.25% SEA Card fee to Kropp Holdings, Inc. (KHI) on the orders in Counts 1 through 26. *See id.* The actual loss, then, comes out to $4,631,987—Butler's gain plus the 2.25% SEA Card fee, minus an allowable 2.25% increase on the true invoices from Integr8. The intended loss is still higher, because Butler's claims for the order in Count 21 were rejected. For that order, Butler input a cancellation charge of $569,803.46 into the SEA Card system. GX 17. He was entitled to charge only for the amount on the true invoice—$3,000—plus the SEA Card fee: $3,069. The intended loss from this order, then, was $566,734. This brings the total intended loss to $5,095,561.

10

While Probation's intended loss calculation came out to a slightly lower number ($5,086,092.71), PSI ¶ 72, this difference has no effect on the Guidelines calculation. For Guidelines purposes, "[t]he court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 n. 3(B). Either calculation results in a loss amount in the $3.5 million – $9.5 million range and an increase of 18 levels.[1]

Butler objects to the PSI's calculations, arguing that Butler was contractually entitled to virtually all the money he defrauded the government to get, bringing the loss amount down to $550,000 or less. But Butler is wrong about the claim that he had enforceable contracts with the military and wrong that his contract argument is relevant to the loss amount under the Sentencing Guidelines.

A. *Butler has no valid contract claims against the military.*

The military did not owe Butler any money because Butler had no valid contract claims. In nearly every case in which Butler informed the military that it would have to pay him back for the full cost of the order if it cancelled, Butler also deceived the military with a lie: that Butler himself was sending money to his supplier in advance to purchase fuel and would not be able to get money back if there were changes or cancellations. *See* GX 4002 ("We are having to buy fuel post confirmation and do not have the option to return product."). The evidence at trial showed that this was false. Butler was lying to the military at the time of contract formation, so all his contracts were obtained by fraudulent inducement. The military agreed to contracts where Butler told the

---

[1] Both the actual loss and the intended loss are, in fact, larger than these numbers because there were other instances in which Butler defrauded the military as part of his scheme. The Government is requesting a restitution hearing to prove the full loss. The Government does not anticipate proving a loss of greater than $9.5 million, so the evidence the Government intends to present would have no effect on the Guidelines calculations. The evidence currently in the record is sufficient for the Court to make a "reasonable estimate" of the loss. U.S.S.G. § 2B1.1 n. 3(B).

military that he would need to be *reimbursed* for the full cost of the order. Butler cannot now claim that the military agreed to pay him even if the money was pure profit rather than a reimbursement.

Contracts one party induces by fraud are voidable at will by the other party. *See, e.g.*, *Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.*, 336 F. Supp. 2d 1239, 1302 (S.D. Fla. 2004), *aff'd*, 470 F.3d 1036 (11th Cir. 2006) ("[I]t is axiomatic that fraudulent inducement renders a contract *voidable.* …  Florida law provides for an election of remedies in fraudulent inducement cases: rescission, whereby the party repudiates the transaction, or damages, whereby the party ratifies the contract.") (quoting *Mazzoni Farms, Inc. v. DuPont,* 761 So. 2d 306, 313 (Fla. 2000)). Butler lied about his anticipated expenses to get the military to agree to pay cancellation costs, and the United States military had the legal right to cancel, elect recission, and walk away from the contract scot-free.

Even absent Butler's lies, the language requiring the military to pay for "THE FULL ORDER" in the event of cancellation would not have been enforceable. GX 4002, *passim*. Florida law—drawing on a long-standing common-law principle—distinguishes between enforceable liquidated damages clauses that approximate the true costs of cancellation and unenforceable penalty clauses that punish cancellation without regard to its true cost. *See Resnick v. Uccello Immobilien GMBH, Inc.*, 227 F.3d 1347, 1350 (11th Cir. 2000) (citing Florida Supreme Court cases).

Under Florida law, damages clauses are only enforceable when both "damages from the breach are not readily ascertainable" and "the sum stipulated is not grossly disproportionate to the damages reasonably expected to follow from the breach." *Id.* Neither of the two necessary conditions for a valid liquidated damages clause obtained with regard to Butler's fuel contracts. Butler's damages were "readily ascertainable" because Integr8, his fuel supplier for all of the

orders at issue here, would email him an invoice setting out the ancillary fees incurred by the cancellation. And the "sum stipulated" by Butler was the entire cost of the order, which bore no relation to the cancellation costs Butler or his supplier incurred. Butler's unenforceable penalty clause does not entitle him to any money.

> B. *Contract claims do not offset loss to a victim.*

The Guidelines do not permit a Defendant to offset the loss amount from his fraud with contractual claims. Section 2B1.1 of the Sentencing Guidelines has clear rules governing both "Exclusions from Loss" and "Credits Against Loss." U.S.S.G. § 2B1.1 n. 3(C)-(D). Contractual claims under the Guidelines are neither exclusions from loss nor credits against loss. Exclusions from loss are limited to (1) interest, penalties, etc. and, (2) the costs of prosecution. Credits against loss are limited to "[t]he money returned, and the fair market value of the property returned and the services rendered … before the offense was detected" and certain other exceptions relevant only "[i]n a case involving collateral pledged or otherwise provided by the defendant." U.S.S.G. § 2B1.1 n. 3(D). Unasserted contract claims are not listed here so they are not taken into account in calculating the loss amount.

This rule is the only feasible one: The false invoices introduced at trial stem from twenty-five separate orders. Contract claims stemming from those orders are properly brought in the Court of Federal Claims. Each of these contracts could be the subject of its own separate lawsuit and bench trial. District Courts do not have the resources to litigate every contract claim a perpetrator of fraud might have against the victims before being able to sentence the defendant.

> 2. The Sophisticated Means Enhancement Applies to Butler's Conduct.

Butler objects to the sophisticated means enhancement on the grounds that his conduct involved "routine commercial transactions carried out through ordinary business

communications." Dkt. 144 at 5. This description of Butler's conduct is at odds with the facts. Butler not only created false invoices, fake emails from Integr8, false order confirmations, and forged wire transfers. He also concealed his identity by pretending to be Adam Ogden, the "Head Bunker Trader" at Richard Eten's company Patriot Disaster. These actions were far from "ordinary business."

The sophisticated means enhancement applies in cases of "especially complex or especially intricate offense conduct pertaining to the execution or **concealment of an offense**." U.S.S.G. § 2B1.1 n. 9(B) (emphasis added). The enhancement covers "[c]onduct such as hiding assets or transactions, or both, through the use of fictious entities [or] corporate shells… ." *Id.* Butler's conduct falls squarely within this definition. He used Patriot Disaster Specialist, a friend's disaster cleanup company, to conceal his identity. Butler assumed the name of his high school classmate Adam Ogden in order to conceal his own role in the fraud scheme. *See* Attachment 1. And he routed payments from the military through the Patriot Disaster bank account to bank accounts he controlled so that the military would not know that he was the one bidding on fuel contracts. *See, e.g.,* TT. Jan 13 at 252 ("This is a little bit more complicated. For [Count 26] the money goes from KHI to Patriot Disaster first, January 19, 2024 … That entire amount is transferred on January 23rd … to a PNC Bank account [controlled by Butler] … .) (testimony of Lisa Klitz). In short, Butler perpetrated and concealed his scheme in sophisticated ways. *See, e.g.*, *United States v. Culver*, 822 F. App'x 976, 981, 984 (11th Cir. 2020) (collecting cases and affirming sophisticated means enhancement where, as here, defendant obtained government contracts through false invoices, using another person's identity as a sham, and hiding his company's involvement by using another vendor as a pass-through).

14

**II.      Based on the § 3553 factors, a 71-month Sentence is Appropriate.**

The Section 3553(a) factors counsel in favor of sentencing Butler to a sentence of at least 71 months of incarceration on each count (to run concurrently) and a total fine within the Guidelines range ($20,000 – $200,000).

   1.   History and Characteristics of the Defendant

"Jasen Butler is a liar." TT. Jan 14 at 160 (Defense closing). "[H]e likes to impersonate other people." *Id.* at 161. "Butler is not somebody you want to get into a business relationship with." *Id.* at 162. That is what **defense counsel** was forced by the evidence to concede in closing. All of it is true.

Although Butler is a zero-point offender, he has been arrested and charged several times— once, notably, for driving away from the police at 80 miles per hour, putting other drivers in danger. PSI ¶ 84. He has been engaged in misconduct since he joined the fuel industry in December 2013. Within nine months of signing up for the SEA Card program, he was suspended and faced debarment proceedings for telling lies, attempting to collude with competitors, and improperly contacting vessels to solicit sole source contracts and ask for direct payments to avoid SEA Card fees.

Butler persuaded DLA to lift the suspension and terminate the debarment proceedings in early 2015 by presenting his wrongdoing as a series of naïve mistakes. He promised to follow the rules in the future: "I have since learned, and will not repeat these errors. I will not risk losing my ability to work with the DLA again." PSI ¶ 58. In truth, Butler only learned that he had to take better care to avoid detection.

By 2017, Butler was submitting falsified invoices to the military for reimbursement.[2] PSI ¶¶ 60-61; *See* Attachments 9-10; *see also* Attachment 11. This scheme continued through the period of the Indictment, during which Butler inflated his cancellation costs by hundreds of thousands of dollars (and in one case, more than a million dollars). When the military held up payment for some of these invoices to examine them more closely, Butler responded with self-righteous messages on SEA Card: "Is this the Navy's new way to save money? Just refuse to pay bills? I wish I could do this with my mortgage." Butler to Navy and DLA Personnel, August 17, 2023, Exhibit 12 at 2. Or: "3 months old. What would happen if you took this long to pay your own bills?" Butler to Navy and DLA Personnel, August 22, 2023, Exhibit 12 at 3. At other times, he tried to make his messages look like automated reminders from the SEA Card system to trick an approving official into paying: "Automated Reminder: Please approve all charges. This note sent to all listed contacts for this contract." August 28, 2023, Exhibit 12 at 4.  While defrauding the military, he insisted that he was saving it money: "The system does not allow us to put in a column of how much we saved them or I would have." GX 2608.

Butler's contempt for anyone other than himself is hard to miss. Even Butler's former friends, like Richard Eten, were viewed by Butler as tools to be used for his schemes. People working legitimate jobs for a low salary are "minimum wage drones." GX 2616. The rules of government contracting are enforced by "Pencil Pushers." GX 3821.  In his posts on X (formerly

---

[2] Butler objects to the inclusion of a false invoice from 2017 in the PSI, because the falsity of the invoice was not proven at trial, which focused on the period in the Indictment, August 2022-January 2024. But the invoice is false: Integr8 confirmed it has no such invoice on file. *See* Attachment 10. And, of course, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Twitter), Butler has taken the position that "[t]oo many morons are breeding." Butler, X, October 20, 2025.

Butler has never expressed remorse for his wrongdoing, nor does he appear to believe his actions were wrong. Butler's self-deception is well documented in his posts on X: Butler is outraged that: "I work too hard to pay too much for groceries while 40m people get free sh*t" (apparently a reference to the government's food stamps program (SNAP)). Butler, X, October 26, 2025. Butler is much less concerned about the "free s[tuff]" he personally received from his fraud scheme. Not only was he happy to steal this money from the government; he also lied to his accountant about the funds he received from the scheme so that he would not have to pay taxes on his ill-gotten gains. *See, e.g.,* GX 3900, GX 3909. And he continues to claim, in his objections to the PSI, that the lies he told the government at the outset mean that he is contractually entitled to virtually all of the money he received from his scheme. *See* Dkt. 144 at 5.

On June 30, 2025—just weeks after his June 11 indictment and June 13 arraignment—Butler lied to a Coast Guard official, CWO Senna, about performing a pre-fueling safety inspection and filling out the accompanying paperwork when fueling a yacht. *See* Attachment 5. He then tricked the yacht's chief engineer into signing backdated paperwork and submitted that backdated document to the Coast Guard. *See* Attachments 6-7. Butler has been given many chances. In light of Butler's submission of false paperwork to the Coast Guard *after* he was indicted, there is no reason to think that he regards falsification of documents as morally wrong—or even too risky to be worth trying again.

2. <u>Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense</u>

Butler committed a serious offense: he criminally defrauded the United States military to enrich himself. Individual military vessels are responsible for the payment of cancellation and

other ancillary fees. Butler's fraudulent cancelation fees were so large that they could jeopardize a vessel's ability to purchase necessary supplies.  *See* TT. Jan 12 at 136, 143 (Testimony of U.S. Coast Guard Chief Christopher Brown, explaining that the cancellation fees comes out of a fund that "is used for everything to maintain the ship and operations, it includes survival gear. It includes maintenance equipment, it can be oils, paints, anything like that to keep the ship operational"; "That is a big thing that you have to tell your command that they are going to lose about a third of their budget.").

Butler's scheme was deeply cynical: he took advantage of the Navy's need for flexibility during critical missions in Europe and the Mediterranean related to wars in Ukraine and Israel. *See, e.g.*, TT. Jan 12 at 54 (Testimony of Commander Gregory Sceviour: "so the port visit [at issue in Count 26] was canceled due to the high risk of drone, threatened drone harassment if the ship were to pull in to Jeddah."). Butler's conduct undermined the military and could have left United States ships without critical supplies.

3. <u>Need for Adequate Deterrence</u>

<u>Specific Deterrence</u>: Twenty days after Butler was indicted for submitting false documents to the Coast Guard in this case, he decided to address his noncompliance with fueling regulations by submitting additional false documents to the Coast Guard. It is not clear how someone with such disdain for the truth and the law can be deterred. It may well be that no sentence is long enough to achieve specific deterrence. But, as set forth below, the public can be protected from Butler during his period of incarceration.

<u>General Deterrence</u>: The Government has several ongoing investigations into the fuel industry for conduct similar to Butler's (as discussed in pretrial motions). *See, e.g.*, Dkt. 99 at 1. Although DLA has since taken some remedial measures on its own, *see, e.g.,* Dkt, 138 at 7, a 71-

month sentence would deter others who are engaging in (or are considering engaging in) conduct similar to Butler's.

### 4.   Protection of the Public

Since it is not clear how Butler can be deterred, a substantial custodial sentence is necessary to protect the public from Butler's schemes. Butler, as defense counsel phrased it, "likes to impersonate other people." This makes him especially dangerous and difficult to deter. The warning to potential business partners from Butler's conviction in this case will not prevent him from finding new victims under a newly assumed identity. The public can only be safe from Butler's schemes while he is incarcerated.

### 5.   Need to Avoid Unwarranted Sentencing Disparities

Judges in this district routinely sentence fraud offenders to sentences comparable to the 71 months the United States recommends for Butler. Recently, in *United States v. Gatlin*, 25-cr-20220 (S.D. Fla. Dec. 12, 2025), the defendant pleaded guilty to conspiracy to commit wire fraud and was sentenced to 80-months' imprisonment. Gatlin submitted nearly $7 million in false invoices to her employer, the Jackson Health Foundation. She had a Guidelines Offense Level of 28 and was a first-time offender (but did not receive the zero-point offender reduction due to an aggravating role in the offense). Butler's misconduct in the instant case is on par with Gatlin's and a 71-month sentence for Butler would be consistent with the sentencing in that case.

Fraud sentences given by this Court include:

- Byram Javat sentenced to 120 months (following a guilty plea) in *United States v. Javat*, 18-cr-20668 (S.D. Fla. December 16, 2019), Dkt. 500 at 114.

- Cory Lloyd and Steven Strong, each sentenced to 240 months (after trial) in *United States v. Lloyd*, 25-CR-80015 (S.D. Fla. February 18, 2026), Dkt. 256, 257.

19

Admittedly, the loss amount and Guidelines range are lower in Butler's case than in either *Javat* or *Lloyd.* And this Court's sentence was below the Guidelines range in both those cases. But the present case has aggravating factors: Butler has spent the bulk of his business career engaged in illegal activity. Butler has previously been treated leniently because he promised to do better. Butler's lack of remorse is apparent. And there is a greater need to protect the public from Butler in the future than in the typical zero-point offender fraud case. A top-of-the-Guidelines sentence of 71 months would not produce unwarranted disparities with other defendants.

   6.  <u>Need to Provide Restitution to Any Victims of the Offense</u>

The military's actual loss proven at trial was $4,631,987. That is the amount of Butler's gain plus the 2.25% SEA Card fee that Butler caused the military to pay to KHI for the orders at issue in Counts 1 through 26 (minus an allowable 2.25% fee on the true invoices from Integr8). *See* GX 4011. But there are other payments to Butler from the period of the Indictment—not addressed at trial—that Butler fraudulently induced as part of the charged scheme to defraud the military. In order to provide full restitution to the victims, the Government requests a restitution hearing within ninety days to prove the additional loss amount.

**CONCLUSION**

In light of the factors in 18 U.S.C. § 3553(a), a sentence of 71 months of incarceration and a within-Guidelines fine is sufficient but not greater than necessary to accomplish the goals of sentencing.

Date: April 1, 2026        Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:    /s/ Elizabeth Young
ELIZABETH YOUNG
Assistant United States Attorney
Court ID No. A5501858
Elizabeth.Young@usdoj.gov
United States Attorney's Office
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (786) 761-3153

OMEED A. ASSEFI
ACTING ASSISTANT ATTORNEY GENERAL
ANTITRUST DIVISION

By:    /s/ Jonathan Pomeranz
Jonathan Pomeranz
Ebonie Branch
Haley Pennington
Trial Attorneys
U.S. Department of Justice
Antitrust Division
450 5th Street NW
Washington, D.C. 20530
S.D. Fla. Special Bar #A5503242
(202) 316-2179
jonathan.pomeranz@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2026 I filed the foregoing document with the clerk of the court and served counsel of record via the CM/ECF System.

<u>/s/ Jonathan Pomeranz</u>

Jonathan Pomeranz