UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  25-80093-CR MIDDLEBROOKS

UNITED STATES OF AMERICA

v.

JASEN BUTLER

     Defendant.

_____/

## JASEN BUTLER'S SENTENCING MEMORANDUM INCORPORATING OBJECTIONS TO SENTENCING GUIDELINE CALCULATIONS AND APPLYING 18 U.S.C. §3553(a) FACTORS

Dated: April 3, 2026

**GOLDBERGER WEISS, P.A.**
1555 Palm Beach Lakes Boulevard
Suite 1400
West Palm Beach, Florida 33401
Tel: (561) 659-8300
Fax: (561) 284-8938
Email: jason@goldbergerweiss.com

/s/JASON S. WEISS, ESQ.
Florida Bar No. 0096040

**BRUCE A. ZIMET, P.A.**
1555 Palm Beach Lakes Boulevard
Suite 1400
West Palm Beach, Florida 33401
Tel: (561) 508-7741
Fax: (954) 760-4421
Email: baz@bruceazimetlaw.com

/s/ BRUCE A. ZIMET, ESQ.
Florida Bar No. 0225053

## TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................................1

II.   SENTENCING GUIDELINE CALCULATIONS..............................................2

    A.  Objections to Pre-Sentence Report Guideline Calculations ............................2

        1.  Additional Facts to be Added to PSR ........................................................3

        2.  Loss Amount PSR Objections ....................................................................8

        3.  Sophisticated Means Enhancement PSR Objection...................................13

        4.  Kousisis, Fraudulent Inducement, and Other Contract Arguments ...........15

            a. Kousisis Does Not Support Treating the Full Contract Value as Loss
               Inducement..........................................................................................16

            b. No "Essence of the Bargain" Materiality.................................................18

            c. Full Value of Contracts Cannot be Attributed as Loss ...........................19

            d.  Loss Calculation Based on the Delta Between the Quoted Ancillary
               Services Price and the Actual Cost of Ancillary Services in Wrong .....20

            e. Cancellation Charges are Not "Unenforceable Penalties".......................19

            f.  The Undisputed Record Establishes a Valid, Awarded Contract
               that the Government Administered and Paid .........................................23

III.  18 U.S.C. §3553(a) FACTORS.......................................................................25

    A.  Nature and Circumstances of the Offense and the History and Characteristics
       of the Defendant............................................................................................25

        1.  Nature and Circumstances of the Offense ................................................25

        2.  History and Characteristics of the Defendant ...........................................28

    B.  Need to Sentence to Reflect the Seriousness of the Offense, Promote
       Respect for the Law, and Provide Just Punishment.......................................32

    C.  Need for Sentence to Afford Adequate Deterrence .......................................32

    D.  Need to Protect the Public from Further Crimes of the Defendant..............33

E.  Need for Sentence to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most in the Most Effective Manner ...................................................................................................33

IV.  **GROUNDS FOR DOWNWARD VARIANCES**...............................................................33

A.  The Guideline Calculation Overstates the Seriousness of the Offenses .........................33

B.  Jasen Butler's Extraordinary Charitable and Philanthropic History...............................34

V.  **CONCLUSION** ......................................................................................................35

**CERTIFICATE OF SERVICE** ...........................................................................................36

## I.  <u>INTRODUCTION</u>

Jasen Butler's life is best understood not through the lens of this case alone, but through a sustained pattern of responsibility, resilience, and service that has defined him since a young age. Early hardship forced him to confront loss at a time when most are still finding their footing. Rather than allowing those experiences to harden him, Jasen Butler built a life centered on family, community, and helping others navigate their own challenges.

Over time, he became the person others relied upon in moments of need – the family member who stepped in during crises, the neighbor who strengthened community ties, and the individual who consistently gave his time and resources to support others, including wounded veterans, local healthcare efforts, and the education and mentorship of children in his family. The many letters submitted to the Court reflect a consistent truth: those who know Jasen Butler do not see a man defined by taking, but one defined by giving. His life, viewed in full, reflects years of perseverance, compassion, and responsibility to others who continue to depend on him.

Jasen Butler also recognizes, without qualification, that he made serious mistakes in this case. He made false statements and altered invoices, and he accepts responsibility for that conduct. He does not seek to minimize or excuse those actions. But acknowledging those errors does not resolve the distinct question before the Court at sentencing – the nature and magnitude of the loss caused or intended by the conduct at issue.

Jasen Butler respectfully acknowledges the Court's prior rulings limiting the presentation of contract-interpretation evidence during the guilt phase and does not seek to revisit those determinations. The issues now before the Court are different. At sentencing, the Court must independently determine the appropriate loss amount under the Sentencing Guidelines – a determination focused not on the fact of conviction, but on the actual and intended economic harm

1

caused by the offense. In that analysis, the contractual framework governing the SEA Card transactions, including how ancillary and cancellation costs were allocated within that system, provides essential context for assessing whether the Government suffered any cognizable loss and, if so, in what amount.

While the Court will ultimately impose a sentence guided by the factors set forth in 18 U.S.C. § 3553(a), the proper calculation of the advisory Sentencing Guidelines range remains the starting point. Here, the Government's proposed loss figure rests on a theory that does not account for the economic realities of the transactions or the governing legal principles that limit loss to harm actually caused or intended. When the record is evaluated under the framework required by the Sentencing Guidelines and applicable case law, the appropriate loss amount, and thus the advisory range, differs materially from that advanced by the Government.

Accordingly, the proper measure of loss becomes the central issue at sentencing. This is where the focus shifts from the fact of wrongdoing to a more precise question: what economic harm actually resulted and how it should be measured under the law.

## II. SENTENCING GUIDELINES CALCULATIONS

### A. Objections to Pre-Sentence Report Guidelines Calculations

Jasen Butler submitted his comments and objections to the Pre-Sentence Report ("PSR") Sentencing Guideline calculations to the Probation Office on March 18, 2026. That correspondence was filed with the Court on the same date. (D.E. 144). Mr. Butler received a revised PSR addressing the March 18, 2026 comments and objections on March 31, 2026. (D.E. 147). Mr. Butler deferred presentation of facts to be included in the "Offense Conduct" section of the PSR until submission of his Sentencing Memorandum. Mr. Butler requests the following facts be added to the PSR:

1. **Additional Facts to be Added to PSR**

a. During the competitive bid process, contractors submit quotes for fixed prices for fuel and non-fuel ancillary services in accordance with the SEA Card Terms and Conditions ("T&C's"), which are updated annually for each fiscal year. Contractors can also propose additional terms/conditions that deviate from the standard terms. *See* **Defense Trial Exhibits 1A, 2, 3A, and 6.**

b. When he submitted bids through the SEA Card system, Butler, as directed by DLA-E, offered fully built-up fixed prices for ancillary services in his quote. In addition, Butler routinely included special conditions regarding order cancellation and other ancillary charges in his quotations for awards of these orders. *See* **Defense Trial Exhibits 36A-W, and 37A-W.**

c. The SEA Card program awards firm-fixed-price commercial contracts within the provisions of FAR Part 12. A fixed-price contract is not subject to adjustment based on the contractor's cost experience. *See* **Defense Trial Exhibit 2 at 68; Defense Trial Exhibit 19;** and **FAR 16.201-1**.

d. Conversely, SEA Card is not a cost reimbursement program. Such a structure is expressly prohibited by the FAR. Under federal law, Government agencies cannot award contracts for commercial services on a cost reimbursement basis. *See* **FAR 16.301-3(b)**.

e. The Government's contractual documents for the SEA Card program included provisions regarding how charges for cancelled orders would be handled if the merchant's SEA Card quotation provided for cancellation charges. *See* **Defense Trial Exhibits 1A, 2, and 3A at 5.**

3

f.  In the Government's contractual materials, in a section labeled Section I, Contract Clauses, the Government included a standard clause FAR 52.212-4, for commercial products, which included provisions addressing the order of precedence (which parts of the document would take precedence over others) and terminations for the Government's convenience. Under paragraph (s) the standard clause, FAR 52.212-4, gave precedence to "[s]olicitation provisions" (such as the cancellation provisions discussed above) over "[o]ther paragraphs of this clause" (such as the termination for convenience provision). *See* **Defense Trial Exhibit 2 at 28.**

g.  Under normal FAR requirements, the Government was to give formal notice of a termination for convenience to launch a structured negotiation process. The indictment and evidence produced at trial did not reference any instances in which the Government gave notice that it was initiating a termination for convenience of the orders at issue. *See* **FAR 12.403 & 49.102**.

h.  On April 6, 2020, Butler received a letter from DLA-E denying his claim for $88,190.31 in reimbursement payments for the fulfillment of two SEA Card Open Market contracts in 2018. In denying his claim for reimbursement of his additional costs to deliver fuel, DLA-E stated: "*SEA Card Open Market contracts are Firm Fixed-Price, which provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract*." *See* **Defense Trial Exhibit 19** (emphasis added).

i.  Between 2015 and 2024, Butler was awarded and completed over 1,000 fuel orders for the military. During the time covered by the Indictment, Butler was awarded and completed 174 fuel orders for the military. *See* **Defense Trial Exhibit 35A-I**. Butler

completed an additional 54 fuel orders for the military in 2024 after his "scheme to defraud" (as alleged by the Government) had concluded. *See* **Proposed Defense Exhibit 35J**.

j. Butler's long-term contract with DLA-E to provide fuel in Nordenham, Germany (Count 27 – MV Sagamore) included a $30.00 fuel price differential, permitting Butler to charge $30/metric ton on top of his price for fuel (from his supplier). *See* **Defense Sentencing Exhibits 1 and 2**.

k. On January 13, 2026, Jamaal Rose, the Director of Fuel for DLA-E, testified at trial that the "price of fuel along with technical acceptability" were the only bid terms that were evaluated by his contracting officers (for the orders charged in the indictment). *See* **TT. Jan 13 at 127**.

> *Q. All of the other columns you were asked about regarding other specific parts of this bid quotation, those are things that you are telling me you would not and your contracting officers would not review or consider for the bid award process?*
>
> *A. At the time of the quote the contracting officer only looked at the unit price times the metric ton for evaluation purposes.*
>
> *See* **TT. Jan 13 at 128**. *See also* **Defense Trial Exhibit 96** (Email from DLA Contracting Officer Francis Murphy stating, "ancillaries are not considered when evaluating offers"); and **Proposed Defense Exhibit 59** (Email from LCDR Sceviour stating, "DLA does not evaluate [comments] as part of the contract award process").

l. The following paragraph was added to the updated SEA Card® Program Terms and Conditions that went into effect on October 1, 2024:

> 8. ALL charges invoiced in SEA Card Online, as well as claims, must be supported with appropriate documentation. For fuel charges this documentation includes a Bunker Delivery Receipt (BDR) signed and dated by a

5

representative of the Government vessel and bearing the vessel stamp, if available. For ancillary charges and other claims, evidence of all costs invoiced must be provided. This may include invoices or other documentation from the fuel or transportation subcontractors showing that the charges were incurred and paid. Failure to provide required documentation may result in the charges being disputed or denied. *See* **Proposed Defense Exhibit 4A** (emphasis added).

The SEA Card Terms and Conditions in effect at the time of the charged offenses did not include this paragraph or any reference to a requirement to submit subcontractor invoices to prove charges were incurred and paid.

m.  On January 13, 2026, Alexander Brown, a senior accountant for Navigate Europe, an affiliate of Integr8, testified at trial that Guiseppe Azzena was the bunker trader with Integr8 who was the primary contact for Butler regarding the orders and invoices charged in the Indictment. *See* **TT. Jan 13 at 83**. Mr. Brown had no firsthand knowledge or information regarding the communication between Azzena and Butler outside of emails that were produced.  *See* **TT. Jan 13 at 83-84** (including Skype calls and other methods of communication). Mr. Brown further confirmed that Mr. Azzena would have been the one to have direct communication with the physical fuel suppliers. *See* **TT. Jan 13 at 86**.

> *Q. You are not aware what, if any, insight Mr. Butler may have into the local suppliers' terms?*
>
> *A. No.*
>
> *Q. Or what charges Mr. Butler could potentially incur from local suppliers in the event of an order cancellation or change?*
>
> *A. No.*

6

> *Q. All of those details would have been handled between Integr8 and its local supplier?*
>
> *A. Yes.*

*See* **TT. Jan 13 at 86**.

n.  On July 30, 2024, the U.S. Navy issued an RFQ (Request for Quote) (Quote #14467) through the SEA Card portal seeking quotes for delivery of 264 metric tons of fuel to the U.S.S. Hershel Williams in Cape Town, South Africa. *See* **Proposed Defense Exhibit 132**. Butler submitted a bid quote for the RFQ, including special conditions regarding order cancellation. *See* **Proposed Defense Exhibits 36X** (Total fuel price = $255,285.36) **and 37X** ("No cancellation is permitted. The fuel order must be paid for regardless if the fuel is loaded in the barge or taken by the ship or cancelled."). On August 8, 2024, Butler's company was awarded the contract. *See* **Proposed Defense Exhibit 128** (Order #61102). Order 61102 was cancelled by the U.S. Navy after the contract was awarded and Butler submitted an IMOS invoice for the agreed-upon cancellation charge of $255,285.36. *See* **Proposed Defense Exhibit 56** (Email from LCDR Sceviour re: cancellation of Order 61102 with IMOS invoice attached). On September 18, 2024, September 26, 2024, and April 4, 2025, the Accountable Official disputed the cancellation charge and stated, "Please provide an invoice from the LOCAL SUPPLIER for the ancillary charge." *See* **Proposed Defense Exhibits 43, 44, and 45**. Butler never uploaded any additional documents. On April 29, 2025, the Accountable Official approved payment for the agreed-upon cancellation charge. *See* **Proposed Defense Exhibit 41**. On April 29, 2025, SEA Card processed a payment to Butler in the amount of $255,285.00 for the cancellation. *See* **Proposed Defense Exhibit 49**.

o. The Integr8 bunker confirmation for Order 57144 – USS Devastator (Count 6) provided for payment in full within 30 days of delivery. *See* **Defense Trial Exhibit 123**. No term in the bunker confirmation put Butler on notice that he would be required to pay the full value of the order ($22,275.00) in the event of a cancellation. Butler was ultimately charged the full value of the order by Integr8. *See* **Defense Trial Exhibit 76** ($22,725.00).

p. The Integr8 bunker confirmation for Order 58940 – USS Antietam (Count 22) provided for payment in full within 7 days of delivery. *See* **Defense Trial Exhibit 122**. No term in the bunker confirmation put Butler on notice that he would be required to pay the full value of the order ($204,244.60) in the event of a cancellation. Butler was ultimately charged the full value of the order by Integr8. *See* **Defense Trial Exhibit 99** ($204,878.90).

q. The Integr8 bunker confirmation for the USS Sirocco, dated October 27, 2022, confirms that Butler was quoted a payment term of "CASH IN ADVANCE" for an RFQ during the charged period of the Indictment, consistent with his representations regarding the variability of supplier payment requirements. *See* **Defense Trial Exhibit 100**.

r. **Appendix A** (attached to this Memorandum) includes all exhibits referenced above and further details the relevant facts for each of the 27 individual wire fraud counts.

## 2. Loss Amount PSR Objections

In Paragraph 72 of the PSR, Butler is alleged to be responsible for a loss amount of $5,086,092.71, resulting in an offense level increase by 18 levels pursuant to § 2B1.1(a)(2). (D.E. 141 at 21). On March 18, 2026, Butler objected to the loss amount calculation stating:

The PSR's calculation appears to rely on assumptions and characterizations that are not supported by the evidence and that fail to account for the contractual terms governing the transactions at issue, including agreed-upon ancillary and cancellation charges reflected in the bid documentation. As a result, the PSR's loss figure materially overstates any actual or intended loss. (D.E. 144 at 3).

Butler's objection to the loss calculation is based on the following unrebutted contract law and interpretation:

- SEA Card contracts are firm fixed price contracts for commercial services.
- Under the applicable terms and conditions of the SEA Card contracts, Butler is entitled to recover the full fixed price that he quoted to the Government for fuel and ancillary services (including cancellation, backhaul, overtime, quantity change, etc.).
- The Government accepted Butler's pricing and terms when it awarded him the orders.
- SEA Card is not a cost reimbursement program.
- Under federal law, agencies cannot award contracts for commercial services on a cost reimbursement basis.
- The applicable terms and conditions of the SEA Card contracts did not limit Butler to reimbursement for costs he incurred as a result of a cancellation or change to an order.
- At no time did the Government give notice that it was initiating a termination for convenience for the orders at issue (which could have limited Butler's recovery to a percentage of the contract price reflecting the percentage of work performed prior to the notice of termination).
- The SEA Card terms and conditions contained a provision addressing the order of precedence which gave precedence to Butler's cancellation provisions over the termination for convenience clause.
- The Government's argument that Butler's fixed cancellation and ancillary fees were subject to the cost recovery principles of a termination for convenience is incorrect.
- Based on the applicable SEA Card terms and conditions, Butler was entitled to payment of his quoted, fixed price cancellation and ancillary charges regardless of whether he incurred and paid those costs.

*See* **Appendix B – Declaration of Professor Christopher Yukins**

The Government, in its Sentencing Memorandum, attempts to reduce its contractual obligations to a vague "policy to make merchants whole" (D.E. 148 at 2), but that characterization is both legally incorrect and fundamentally misleading. What the Government describes as "policy"

9

is, in reality, governed by a comprehensive framework of federal procurement law and binding contractual terms.

Federal procurement contracts are not governed by ad hoc practices or discretionary "policies." They are governed by the Federal Acquisition Regulation (FAR) and by the specific terms negotiated and incorporated into each contract. Here, those obligations were defined by the parties' agreements and by established regulatory schemes addressing cancellations and terminations. The Government, at sentencing, seeks to retroactively recast its contractual obligations as a discretionary "policy," untethered from the governing regulatory and contractual framework. That position cannot be reconciled with federal procurement law. The Government cannot both rely on its contracts to obtain performance, then disavow those same contracts when it comes time to honor the agreed-upon allocation of risk.

For the orders at issue, the Government received exactly the benefit of its bargain, including in instances involving cancellation or ancillary charges. DLA-E obtained precisely what it contracted for and agreed to pay. That is no accident. It is the result of DLA-E's deliberate choice to procure fuel under a FAR Part 12 firm-fixed-price commercial contract, a structure that shifts the risk of performance and cost variability to the contractor while insulating the Government from that risk. The Eleventh Circuit recognized that a firm-fixed-price contract places the risk of high costs on the contractor:

> A pure fixed price contract requires the contractor to furnish the goods or services for a fixed amount of compensation regardless of the costs of performance, thereby placing the risk of incurring unforeseen costs of performance on the contractor. In a fixed price contract, if the final total costs of the agreed upon services exceed the contracted price, the contractor takes the loss; *conversely, he can profit if the costs are lower than the contract price.*
>
> See *S&B/BIBB Hines PB 3 Joint Venture v. Progress Energy Florida, Inc.*, 365 F. App'x 202, 203 (11th Cir. 2010) (emphasis added) (internal citations and quotations omitted).

10

By requesting and accepting firm-fixed-price quotes, DLA-E affirmatively chose to limit its risk in sourcing fuel on a global scale. It was insulated from market fluctuations and operational variables – including material shortages, price increases, and labor constraints – both in performance and upon cancellation. This structure also significantly reduced DLA-E's administrative burden by eliminating the need to monitor, adjust, or renegotiate terms with vendors worldwide.

In exchange for these benefits – defined pricing and minimized risk – DLA-E agreed to pay firm-fixed prices for both fuel and ancillary services. It evaluated Butler's quotes alongside competing offers and was required to select the best value for the Government. See **Defense Trial Exhibit 9**. Having done so, the Government necessarily received the value of its bargain at the time each order was placed.

Permitting the Government to retroactively reduce agreed-upon prices to the actual costs of ancillary services, rather than the fixed prices it accepted, "would subvert the entire purpose of a fixed-price contract." _S&B/BIBB Hines PB 3 Joint Venture_, 365 F. App'x at 205–06. The contracts at issue guaranteed DLA-E the timely delivery of fuel that met specified quality and quantity requirements across the globe and provided compensation mechanisms when its customers altered their plans. The Government's attempt to recast ancillary services as cost-reimbursement items after the fact disregards the core benefit it secured: the advance allocation of performance and cost risk to the contractor through fixed pricing.

The specific SEA Card terms and conditions do not limit cancellation charges to reimbursement of costs incurred and paid. To the contrary, they expressly permit merchant-defined ancillary and backhaul charges, require that "all associated costs" be passed through to the customer, and recognize that such charges apply "whether the fuel is taken or not." _See_ **Defense**

11

**Trial Exhibits 1A, 2, and 3A at 5**. That language reflects a commercial allocation of logistical risk, particularly in foreign ports, not a cost-reimbursement regime. The Government's interpretation improperly reads limitations into the contract that are not there.

Attached as **Appendix C**, Butler provides a detailed loss calculation that more accurately reflects both the governing contractual framework and the evidence in the record. As shown in that analysis, when the relevant contractual terms and amounts are properly accounted for, the loss amount decreases from $5,086,092.71 (corresponding to an 18-level increase) to $302,804.74 (corresponding to a 12-level increase).

The $302,804.74 total is calculated as follows:

- Count 2: **$48,282.00** loss based on absence of specific cancellation terms in Merchant Quote comments section of bid quote ($58,282.00 paid by Government - $10,000.00 Integr8 cancellation invoice paid by Butler)
- Count 3: **$193,244.00** loss based on absence of specific cancellation terms in Merchant Quote comments section of bid quote ($208,224.00 paid by Government - $15,000.00 agreed-upon cancellation and quantity change fees)
- Count 5: **$41,108.00** loss based on absence of specific cancellation terms in Merchant Quote comments section of bid quote ($48,608 paid by Government - $7,500.00 agreed upon cancellation fee)
- Count 27: **$23,170.74** loss based on additional contracted $30.00 fuel price differential (charged $1,041 per metric ton instead of $1,012 per metric ton)
- Count 21: **$3,000.00** credit owed (Integr8 cancellation fee)

Finally, Jason Butler objects to the Government's request that the Court schedule a "restitution hearing within ninety days" to establish additional alleged losses. The Government has had ample time to investigate this case – indeed, it did so for more than two years – and made a deliberate charging decision to proceed on the specific orders and invoices presented at trial. Sentencing was then scheduled 84 days after the verdict, providing the Government with a full and fair opportunity to marshal and present its loss evidence. Having chosen its theory, evidence, and scope of prosecution, the Government should not now be permitted to expand the case post hoc by

seeking additional time to prove new or broader loss amounts tied to an alleged "scheme" it has long identified and fully investigated.

### 3. Sophisticated Means Enhancement PSR Objection

It is also alleged in Paragraph 72 of the PSR that Butler's offense level should be increased by 2 levels because his offense involved "sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." (D.E. 141 at 21).

The Sentencing Guidelines provide for a 2-point enhancement where a fraud-based offense "otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means...." U.S.S.G. §2B1.1(b)(10). In this context, "sophisticated" means "[v]ery complex or complicated." The American Heritage Dictionary of the English Language 1658 (4th ed. 2009). Consistent with this understanding, the application note for §2B1.1(b)(1) defines "sophisticated means" as an "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." §2B1.1 cmt. n.9(B).

Before being amended in 2015, §2B1.1(b)(10) applied if the offense involved sophisticated means. *See United States v. Presendieu*, 880 F.3d 1228, 1244, 1248–49 (11th Cir. 2018). As currently phrased, however, the sophisticated means enhancement is both offense-based *and* defendant-based. District courts must therefore determine whether the defendant himself intentionally engaged in or caused the conduct constituting sophisticated means. *See* § 2B1.1(b)(10); U.S.S.G. App. C, Amend. 792 (U.S. Sent'g Comm'n Nov. 1, 2015).

In post-2015 cases, the application of the sophisticated means enhancement has been upheld when the defendant took "especially complex or especially intricate" steps to further the scheme. For example, in one case the defendant organized and led the criminal activity, which "involved repetitive coordinated activities and sophisticated technologies to perpetrate

13

fraud ...." *United States v. Bell*, 112 F.4th 1318, 1342 (11th Cir. 2024) (internal quotation marks omitted). In another case, the defendant used sophisticated means by paying her salespeople through an unaffiliated company and having them "research target investors' financial assets, sometimes rewarding salespeople for finding investors with IRA accounts." *United States v. Wheeler*, 16 F.4th 805, 830 (11th Cir. 2021).

"For purposes of the enhancement, ... sophistication 'refer[s] not to the elegance, the "class," [or] the "style" of the defrauder[,] ... but to the presence of efforts at concealment that go beyond ... the concealment inherent in [ ] fraud.' ") (alterations in original) *United States v. Milligan*, 77 F.4th 1008, 1014 (D.C. Cir. 2023) (quoting *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001)). *Cf. United States v. Guldi*, 141 F.4th 435, 452 (2d Cir. 2025) ("[T]here is nothing sophisticated about moving money out of one's bank account soon after receiving a fraudulently induced transfer.... Guldi's suggestion to use cashier's checks, rather than withdrawing thousands of dollars in cash, does not transform this obvious move into a ruse worthy of an enhanced sentence.").

The record here falls short of the standard required for a "sophisticated means" enhancement. Nothing about Mr. Butler's conduct reflects the kind of "especially complex or especially intricate" execution or concealment that U.S.S.G. § 2B1.1(b)(10) contemplates. There were no layered transactions, shell entities, offshore accounts, or coordinated efforts designed to evade detection, the very hallmarks courts routinely rely upon to sustain this enhancement.

At most, the conduct involved straightforward invoice alterations to facilitate payment. That type of conduct is neither novel nor elaborate; it represents the ordinary concealment inherent in many fraud cases and does not, standing alone, rise to the level of "sophisticated means." Nor

has the Government made the required post-2015 showing that Mr. Butler himself intentionally engaged in or caused any especially sophisticated mechanism of concealment.

The Government's reliance on Mr. Butler's brief association with Patriot Disaster Specialist and his use of the name "Adam Ogden" fares no better. Those facts do not relate to the execution or concealment of the charged conduct. Critically, there is no evidence that Mr. Butler was ever prohibited from bidding on SEA Card contracts under his own name or company. To the contrary, the record shows that after his short tenure with Patriot Disaster Specialist, Mr. Butler resumed bidding openly on SEA Card orders, completing an additional 54 fuel orders for the military in 2024.

On this record, applying the enhancement would improperly collapse the distinction the Guidelines and case law carefully maintain between routine fraud and truly sophisticated schemes. Because the Government has not carried its burden of demonstrating materially greater complexity or concealment, the two-level enhancement should not apply.

### 4. **Kousisis, Fraudulent Inducement , and Other Contract Arguments**

Unable to justify a higher loss calculation under the SEA Card contract's clear terms, the Government instead contends that Butler fraudulently induced the contract award through alleged misrepresentations during the bidding process.

Paragraph 4 of the Indictment states as follows:

> From as early as 2022, JASON BUTLER, on behalf of IMOS, bid on fuel contracts through SEA Card, in many cases falsely stating that if the Government accepted his bid then cancelled the order or made changes, BUTLER's business would incur large fees.

*See* D.E. 1 at 4.

As a threshold matter, the Indictment does not plead a theory of fraudulent inducement. It instead alleges a scheme limited to post-contract invoice falsification and reimbursement fraud.

15

The Indictment contains no allegation (and no evidence was presented at trial) that the Government relied on any misrepresentation in awarding the contracts, that any such statement was material to the award decision, or that the contracts were fraudulently obtained. To the contrary, each wire fraud count is tied to a specific invoice amount and a dated submission of altered documentation. Accordingly, the charged scheme concerns false ancillary reimbursement submissions, not the procurement of the contracts themselves.

Nevertheless, in closing, the Government argued: *"Again, ladies and gentlemen, these contracts were lies from the jump. From the very beginning when he bids he is lying…"*. *See* TT. Jan 14 at 125.

That argument highlights a fundamental disconnect between the scheme actually charged and the broader theory the Government now attempts to advance. Even at trial, the Government tried to recast the case as involving fraud in the bidding process, despite the absence of any such allegation in the Indictment and the manner in which each count was charged and presented to the jury. That reframing cannot now be repurposed at sentencing to expand the scope of the alleged loss.

Loss must be anchored to the scheme that was actually charged and proven. The Government cannot transform this case into one of fraudulent inducement at sentencing in order to claim contract-value loss. That theory finds no support in the Indictment, the trial evidence, or governing law.

a. **<u>Kousisis Does Not Support Treating the Full Contract Value as Loss – Inducement</u>**

Throughout these proceedings, the Government has relied on <u>*Kousisis v. United States*</u>, 605 U.S. 114 (2025), to support its theory and oppose Butler's defense. The Government's attempt to attribute the full value of the SEA Card contracts as "loss" is inconsistent with both the Sentencing

Guidelines and the limited fraudulent-inducement theory recognized in *Kousisis*. The trial record and undisputed contractual framework establish that Butler's alleged misrepresentations neither induced the contract award nor concerned any material term of the bargain. Instead, any alleged misrepresentations relate, at most, to post-award issues in a fixed-price procurement system where payment obligations were determined at the time of award.

At its core, *Kousisis* is a case about inducement. The Supreme Court framed the issue as one in which a defendant "induces a victim to enter into a transaction under materially false pretenses." *Id*. The misrepresentations must therefore operate <u>at the moment of contract formation</u> and must be capable of influencing the Government's decision to award the contract.

That required nexus to the award decision is missing here. The Indictment alleges that contracts were awarded through the SEA Card system under a lowest-price technically acceptable (LPTA) framework. *See* **D.E. 1 at 1**. Under that system, the Government's decision turns on price and technical acceptability, not downstream invoicing contingencies or how a contractor internally structures payment timing with suppliers. This evaluation framework was confirmed by Jamaal Rose, the Director of Fuel for DLA-E, who testified at trial that the "price of fuel along with technical acceptability" were the only bid terms that were evaluated by his contracting officers (for the orders charged in the indictment). *See* **TT. Jan 13 at 127**.

The Government cannot plausibly claim it was induced by statements that, while clearly stated in the bid, were never reviewed or considered in the award process. Where the undisputed evidence shows the contracts were awarded on an LPTA basis – driven solely by lowest price – there is no logical basis to conclude that any such statements influenced or even had the capacity to influence the decision.

17

More fundamentally, the specific alleged misrepresentation, that Butler was required to pay for fuel in advance of delivery, was not an "inducement" to award the contract – it was the opposite. In the SEA Card environment, where cancellations were frequent and anticipated, a representation that funds must be committed in advance, and thus not recoverable, signaled **increased financial exposure to the Government** in the event of cancellation. That representation, truthful or otherwise, would reasonably make Butler's bid **less** attractive, not more. It introduces rigidity, risk, and the potential for higher cancellation costs, factors that cut against the Government's economic interests.

In other words, the alleged misrepresentation was, logically, a **disincentive**. It did not make Butler's bids more competitive – it made them less desirable. That reality is irreconcilable with any theory that the Government was "induced" to award contracts to Butler because of that (mis)representation. Where a statement, by its nature, would tend to discourage the Government from contracting, it cannot satisfy the nexus requirement of fraudulent inducement.

### b. No "Essence of the Bargain" Materiality

Even where proof of intended economic loss is not required, _Kousisis_ makes clear that materiality remains a "demanding" limitation, confining liability to misrepresentations that go to the "essence of the bargain." _Id_. at 135 (citing _Universal Health Services, Inc. v. United States ex rel. Escobar_, 579 U.S. 176, 194 n.5 (2016)).[1] Although the Court did not resolve whether the statements at issue in _Kousisis_ were material, Justice Sotomayor's concurrence underscores what satisfies that standard: a misrepresentation tied to a core eligibility requirement. _See Id_. at 161-62

---

[1] As Justice Thomas noted in his concurring opinion, the Government argued that the "standard for materiality in this context is the one articulated in _Universal Health Services, Inc. v. United States ex rel Escobar_, 579 U.S. 176 (2016) – whether a misrepresentation went to the very "essence of the bargain." (citing to Brief for United States 43).

(compliance with disadvantaged-business participation rules defined what the Government was purchasing and played a critical role in achieving the "essential goal of the contracts"). Such a representation is not collateral or ancillary; it is fundamental to the bargain itself.

The alleged misrepresentations here are categorically different. Butler's statements regarding advance and nonrefundable payments to his supplier upon confirmation did not alter:

- the price of fuel,
- the quality or quantity of fuel to be delivered,
- the timing of delivery,
- or any technical requirement of performance.

Nor did the alleged misrepresentations affect the Government's contractual entitlement or obligations at the time of award. The SEA Card contracts already contemplated cancellation scenarios and defined how ancillary fees would be handled. Those terms, agreed upon at award, governed the parties' rights regardless of how Butler financed or structured his supplier relationships. Thus, any misrepresentations did not change the "essence of the bargain." They did not transform what the Government was buying or what Butler was obligated to provide (i.e., fixed priced fuel and ancillary services).

For the Government, the benefit and "essence" of the bargain here, in addition to a low price of fuel, was fixed cancellation and ancillary prices that defined the Government's liability before it elected to cancel or change an order. Without those upfront, agree-upon prices, the Government would have been liable for whatever sums Butler's suppliers may have decided to charge – fees that Butler was often not privy to in advance.

c. **Full Value of Contracts Cannot Be Attributed as Loss**

Because the alleged misrepresentations neither induced the contracts to be awarded nor affected their essential terms, there is no basis to treat the contracts as fraudulently obtained. The Government received exactly the bargain it struck at the time of the award, competitively priced

19

fuel contracts subject to defined cancellation and ancillary fee provisions. Under these circumstances, attributing the full value of the contracts as "loss" is incompatible with _Kousisis_ and a fraudulent inducement theory. Nothing in _Kousisis_ or elsewhere endorses treating legitimately awarded contracts as entirely tainted based on alleged misrepresentations that were immaterial to the bargain, and, if anything, would have discouraged the award in the first place. Under §2B1.1, the Government cannot treat the full value of the contracts as loss. At most, any loss is limited to proven overpayments on specific ancillary-fee claims as outlined above and in **Appendix C**.

    d. **Loss Calculation Based on the Delta Between the Quoted Ancillary Services Price and the Actual Cost of Ancillary Services is Wrong**

Even accepting the Government's theory that Butler intended to make material, fraudulent misrepresentations, the Government's argument for loss calculation is wrong.

[T]he victim's loss will normally be the difference between the value [it] gave up and the value [it] received." _United States v. Nagle_, 803 F.3d 167, 180 (3rd Cir. 2015); _see also_ U.S.S.G. §2B1.1 cmt. n.3(D)(i) (Nov. 2024) (loss "shall be reduced by…the fair market value of the…services rendered by the defendant…to the victim before the offense was detected."); _see also United States v. Harris_, 821 F.3d 589, 606 (5th Cir. 2016) ("The difference between the contract price and the fair market value of services rendered reflects the contracting agencies' losses under their respective contracts – the difference between what they paid and what they received."). It is the Government's burden to prove loss. _Id_.

As explained above, the Government received what it paid for. DLA-E received the option for quality fuel on demand at fixed prices, including charges for cancelling orders in full or in part, and the SEA Card merchants, like Butler, provided fixed pricing that met the Government's needs. The firm-fixed-price cancellation fee and ancillary charges in this case are akin to a liquidated

20

damages clause (solicited by the Government in its RFQ) to pay a set price in the event of cancellation that Butler inserted into the quote and the Government accepted.

### e.  Cancellation Charges are Not "Unenforceable Penalites"

One hundred percent cancellation charges are not an "unenforceable penalty clause." Such charges are common in the commercial market and have been found to be legitimate in other FAR Part 12 government contracts. *See* CSI Aviation Inc. v. Dep't of Homeland Security, CBCA 6385, 2024 WL 511904 (Feb. 2, 2024) ("*CSI II*") (finding that the contract provided for 100% cancellation charges that took precedence over the termination for convenience clause in the event of conflict).

A cancellation fee cannot be an "unenforceable penalty" when (i) the standard commercial marketplace subjects everyday buyers to 100% cancellation fees when those buyers agree to the vendor's standard terms, including for common commercial services such as airline flights, hotel stays, and rental cars, (ii) the Government has agreed to similar 100% cancellation terms in other contracts, *see* CSI Aviation, Inc. v. Gen. Servs. Admin. *CBCA 6543, 2020 WL 1894728 (Apr. 9, 2020) ("CSI I")*; CSI II, *supra*, and (iii) if, as we believe is the case, the Government has agreed to such terms with other merchants under the SEA Card Program.

Accordingly, a predetermined cancellation fee is not only permissible under the FAR but it also makes sense in cases where cancellation is so common that the Government "envision[s] that offerors would propose cancellation provisions," CSI II at 12, and wants to limit the Government's obligation. That was plainly true in the case of the SEA Card program, where cancellation of orders were so prevalent that DLA-E structured its bidding portal to (i) require quoters to input a cancellation fee in advance, and (ii) provide quoters the ability to propose additional terms and conditions for the Government to evaluate and reject if they are unacceptable.

For the orders at issue here, Butler made clear that the Government would be subject to full payment regardless of whether all the fuel was taken, and the Government accepted those terms. For those orders, there is no loss to the Government if it paid Butler cancellation charges that exceeded his actual costs because the Government specifically agreed in advance to pay the full price in the event of a cancellation. There is no law or principle of procurement law that "bar[s] an agency from negotiating such a fixed termination or cancellation charge in advance." *CSI I*, supra. The Government can, and here did, agree to pay a fixed fee if the Government cancelled an order. That contractual agreement must be the baseline to measure any loss.

In its Sentencing Memorandum (D.E. 148 at 12), the Government cites a case involving daily liquidated damages provided for in a settlement agreement relating to ongoing violations of the Americans with Disabilities Act. *See Resnick v. Ucello Immobilien GMBH, Inc.*, 227 F.3d 1347, 1351 (11th Cir. 2000) (applying Florida law to a disputed agreement that arose in Florida between two private parties). The Government's reliance on Florida law to argue that Butler's cancellation terms are unenforceable is misplaced and flawed.

Under the Supremacy Clause, federal law governs federal procurement contracts. Where, as here, there is an established federal regulatory regime governing contract formation, performance, and termination, state law cannot be used to override or invalidate those federal standards. Attempting to import state-law limitations on liquidated damages into this federal procurement framework would improperly displace federal law and undermine the uniformity that the FAR is designed to ensure. The Government's position would effectively allow state law to rewrite federal contracts after performance has occurred – an outcome that is incompatible with both the Supremacy Clause and the settled structure of federal procurement law.

Regardless, as discussed above, a 100% cancellation charge is a pricing term that is common in the commercial marketplace and has been approved by the Government. *See CSI II* at 12-13 (finding that the contractor's "terms and conditions provide for payment of a 100% cancellation charge" while deferring on summary judgment the resolution of disputed facts as to "which flights were cancelled and subject to the cancellation fee"). Because this is exactly the type of fee that is common – and indeed the "solicitation issued by [the Government] envisioned that offerors would propose cancellation provisions," *id*. – it is not an "unenforceable penalty charge" like the unlimited, daily liquidated damages fees in the *Resnick* case – a case that is not remotely similar to this matter either procedurally, factually, or legally.

**f.**     **The Undisputed Record Establishes a Valid, Awarded Contract That the Government Administered and Paid**

The Government's sentencing memorandum advances a sweeping claim that Butler "had no valid contract claims" and that the military "did not owe [him] any money." (D.E. 11-13). That position is not only legally flawed under federal procurement principles, but also directly contradicted by the undisputed transactional record.

The July–August 2024 Cape Town, South Africa transaction (paragraph n, supra) reflects a textbook federal procurement sequence:

- The Navy issued RFQ #14467 through the SEA Card system seeking a firm-fixed-price quote for fuel delivery.
- Butler submitted a bid that included explicit, non-ambiguous cancellation terms: "No cancellation is permitted. The fuel order must be paid for regardless…if the fuel is taken by the ship or cancelled. This is non-negotiable."
- The Navy accepted Butler's bid quote and awarded Order #61102 on August 8, 2024.

At that moment, the Government formed a binding contract incorporating the very terms it now disclaims. The Government's own actions after cancellation are even more telling:

- After cancelling the order, the Navy received an IMOS invoice for the exact agreed-upon cancellation amount: $255,285.36.

- The Accountable Official did not reject the charge as invalid or unenforceable. Instead, over multiple communications, the Government treated the charge as payable, requesting only supporting documentation from a local supplier.
- When no additional documentation was provided, the Government still approved the charge on April 29, 2025, and SEA Card processed payment in full.

This sequence is irreconcilable with the Government's sentencing position. If the contract were "void," or if Butler had "no valid contract claims," the Government would not have:

- engaged in a months-long documentation review process,
- treated the charge as subject to verification rather than rejection, or
- ultimately approved and paid the invoice.

Instead, the Government acted exactly as procurement rules require. It administered an awarded contract, evaluated a charge under that contract, and approved payment.

This transaction highlights why the Government's loss analysis is fundamentally distorted. The payment at issue was not the product of deception overriding Government safeguards, it was the result of:

- a competitively awarded contract,
- with clearly stated pricing and risk allocation,
- followed by Government review and approval, and
- culminating in authorized payment.

That sequence reflects a contractual allocation of risk – not an automatic economic loss. At minimum, it demonstrates that the Government's categorical assertion that Butler had "no entitlement" to such payments is incompatible with both procurement law and its own real-world conduct.

In sum, the Cape Town transaction exposes the disconnect at the heart of the Government's sentencing argument. The Government seeks to disregard the very contract it awarded, the terms it accepted, and the payments it approved. Federal procurement law does not permit that kind of after-the-fact revisionism, and neither does the record.

### III.  18 U.S.C. §3553(a) FACTORS

**A.  Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.**

**1.  Nature and Circumstances of the Offense:**

The Government's characterization of this case as a straightforward theft of millions of dollars presents an incomplete and distorted account of the offense conduct. A full and accurate understanding of the "nature and circumstances" requires consideration of the contractual framework in which the conduct occurred, the operational realities of the SEA Card program, and the manner in which the charged conduct arose.

Between 2015 and 2024, Mr. Butler was awarded and successfully completed more than 1,000 fuel orders for the United States military, including 174 orders during the period charged in the Indictment. His business was not built on deception – it was built on performing competitively awarded, firm-fixed-price contracts across the globe. In fact, even after the conduct alleged in the Indictment concluded, Mr. Butler continued to perform additional fuel orders for the military, further demonstrating that his role in this system was not that of an outsider exploiting it, but a contractor operating within it.

The structure of the SEA Card program is central to understanding the offense. These were firm-fixed-price commercial contracts governed by federal procurement law, not cost reimbursement arrangements. Under that system, the Government deliberately chose to shift performance and cost risk to the contractor in exchange for price certainty and operational flexibility. When the military took delivery of fuel, at times and locations of its choosing, it received exactly what it bargained for, often at highly competitive prices that left Mr. Butler with minimal or no profit.

25

Critically, Mr. Butler's "scheme" was not triggered by ordinary performance; it was entirely dependent on a separate event outside of his control: the Government's decision to cancel or materially change an order. Only in those circumstances did the issue of cancellation charges arise. When orders were fulfilled as planned, the Government benefitted from the SEA Card system, and Mr. Butler frequently absorbed the economic risk inherent in fixed-price contracting.

The Government's narrative further oversimplifies the central factual dispute. The issue is not whether Mr. Butler knew at the time of his bid quote that his fuel suppliers would require payment in advance. Rather, the critical question is whether, at the time he submitted his bids, Mr. Butler knew for certain whether he would be held responsible for the full value of an order in the event of a cancellation. The record demonstrates that he did not. Indeed, in two charged instances, (Counts 6 and 22), Mr. Butler was later invoiced by his supplier for the full value of the order without prior notice that such exposure existed. These events underscore the uncertainty and risk embedded in the supplier relationships underlying the contracts.

The Government also overlooks a key economic reality: when the military proceeded with delivery, it received the benefit of its bargain, and Mr. Butler's costs – not his profits – often controlled the outcome. It was only when the Government exercised its discretion to cancel or modify orders that disputes arose regarding the allocation of financial responsibility under the contract terms the Government had accepted.

Mr. Butler has consistently acknowledged that he made serious mistakes. He falsified invoices and submitted inaccurate documentation to obtain payment. Those decisions were wrong. They reflect poor judgment and a failure to pursue lawful remedies. As Mr. Butler now recognizes, the appropriate course would have been to challenge disputed payments through legal avenues, such as an action in the United States Court of Federal Claims, as other contractors have now done

26

in similar circumstances. *See* **Alterna Energy v. USA, 25-CV-00052-TMD** (SEA Card contract terms lawsuit pending in U.S. Federal Court of Claims).

But those errors do not transform the nature of the underlying transactions into theft of money to which he had no conceivable claim. This case is materially different from a typical fraud in which a defendant fabricates entitlement from whole cloth. Here, the payments at issue arose from contracts the Government awarded, priced, and performed under contracts that, at a minimum, provided a legitimate framework for recovery of cancellation and ancillary charges. The Government's own conduct in administering, reviewing, and in some instances approving those payments reinforces that reality.

The dispute in this case, and the reason it proceeded to trial, is rooted in the proper calculation of loss. Pre-indictment, Mr. Butler was prepared to accept responsibility for his conduct, but the parties fundamentally disagreed on whether the payments at issue represented unlawful gain or contractually grounded entitlement. That disagreement remains the central issue at sentencing. It is not a peripheral consideration; it is the defining feature of how this offense should be understood.

Finally, the broader context matters. The legal framework governing these contracts was sufficiently clear that, after the conduct at issue, the Government revised the SEA Card Terms and Conditions to require documentation of actual supplier costs before payment of ancillary charges. That change reflects a recognition that the prior system allocated risk differently and consistent with Mr. Butler's understanding of the contracts at the time.

In sum, the nature and circumstances of this offense are not accurately captured by labels such as "theft" or "pure fraud." This is a case in which a contractor, operating within a legitimate and complex federal procurement system, made wrongful decisions in how he pursued payment,

but did so in the context of contracts that governed, and in many respects supported, the very payments now characterized as loss. That distinction is critical to assessing culpability and to determining a sentence that is sufficient, but not greater than necessary under 18 U.S.C. § 3553(a).

### 2. History and Characteristics of the Defendant:

Jasen Butler has always been the person who has come forward to help others. From a young age he stepped into a stabilizing role within his family, and over time that characteristic intersected with all areas of his life – supporting his siblings, helping rebuild his father's finances, caring for family members during difficult periods, and quietly helping others around him. People who know Jasen consistently describe someone who reliably follows through on what he takes on, both in larger responsibilities and in the way he lives his daily life.

Jasen Albert James Gilbert Butler was born on November 12, 1987 in Summerville, New Jersey to James Arthur Butler ("Jim") and Johanna Sonia Butler ("Joey"). Jim and Joey had married in 1981. Their first child Jacqueline was born in March of 1982. Their second child Jasen followed five years later. Their second son Jesse was born in 1992, and their youngest child Jenny was born in 1998.

During Jasen's elementary school years, the family financially flourished. Jasen was doing well academically, and family life was settled. His father involved all the children in extracurricular sports and helped coach their teams. There were four children at home and with involvement from their mother and enormous effort from their father, they functioned as a stable family unit.

Jasen especially adored his older sister Jaclyn, whom he admired for her intelligence and sophistication. She was warm, protective, and loving toward him.

Jasen's idyllic life shattered when he was twelve years old.

One morning, as Jasen was in the kitchen getting ready for school, his father went outside to feed the horses. Moments later, Jasen heard what he describes as an "earth-shattering scream." His sister Jaclyn, who was seventeen, had died by suicide in the family barn. This moment is etched in Jasen's memory for life.

The Butler family still struggles to speak about that day. For Jasen personally, the impact was profound. Because of the closeness they shared, Jaclyn's death meant the loss of someone who had been an emotional anchor in his childhood.

By the time Jasen reached ninth grade the family environment had deteriorated enough that he was no longer regularly attending school. He was officially homeschooled, but in reality, spent those years reading, trying to teach himself, or simply keeping busy however he could. Regardless of the exact cause, the result was that Jasen spent a portion of his adolescence outside of a traditional school environment during one of the most difficult periods of his life.

Jasen returned to school in eleventh grade and did well both academically and socially. During this time, he also began working multiple jobs – including as a busboy in a restaurant and assisting in an art studio – to support himself and financially contribute to the family.

Jasen had turned eighteen when he was diagnosed with cancer (fibro myxoid sarcoma). Jasen's mass was thought to be benign when surgically removed. It wasn't until Christmas Day that Jasen's surgeon called with the news that the mass was malignant. Jasen then underwent a second surgery that was followed by brachytherapy.

After graduating high school in 2007, Jasen attended community college for two years and then transferred to the University of Florida in Gainesville for another two years. Throughout this time, he worked, became financially independent, and continued to support his siblings emotionally and financially whenever and however he could.

Jasen was introduced by his father to the opportunity to sell fuel through government contracts and eventually branched off into that area. While his father's side of the business continued to struggle, Jasen's work began to succeed, allowing him to provide meaningful financial support to the family.

When his father later required hip surgery and it became clear that he could not safely recover at home, Jasen invited him to move into his home so he could care for him. Jim has lived there ever since, and Jasen continues to support him.

In 2016, Jasen met his long-term partner, Tara Jacobs, through her brother. Tara and Jasen were friends for several years before their relationship became romantic. Nearly ten years later, those who know them describe the two as "inseparable." Tara describes Jasen as someone whose instinct is to help the people around him succeed. She credits him with encouraging her to leave a job she disliked and pursue her passion for training horses. With his support, she started her own business, which has since become successful. As Tara states, "this man is the cheerleader for everyone."

Jasen's acts of generosity are endless. Celeste London and her husband describe in a letter to the Court Jasen regularly bringing them baked goods. Mary Marino shares that when her husband had open-heart surgery Jasen "stepped in, cut my lawn, brought my trash cans from the street to my house and grocery shopped for me." Karen Gargiso writes to the Court concerning Jasen helping her find a job in a time of need. When William S. Nogueras was deployed overseas Jasen constantly checked in on his family to make certain they were well. Jasen even offered to help finance Doron Amitai's wedding when he was financially struggling.

Emily VonAlenbruck's experience personifies Jasen. When her grandmother passed, Jasen "did not simply express sympathy and move on. He stayed present, checked in, and helped in

30

ways that mattered." She also recognizes Jasen's larger contributions, "he does not simply talk about community. He actively tries to create it." As Casey Timor describes "Community is one of his base values, concrete to his being – for friends, family, and complete strangers."

Jasen is most proud of his involvement in the national cleanup missions organized by the "We Fund the Blue Foundation." Jasen has volunteered for projects in Washington, D.C. and Philadelphia cleaning neglected areas and supporting other volunteers and first responders.

In 2015 Jasen started a local nonprofit green market to support local businesses. Proceeds were donated to a college fund for local students. In 2017 Jasen began hosting an annual family friendly gathering where neighbors convened to burn their Christmas trees and support local bands. Now in its ninth year the celebration saw nearly 200 people attending this past year holiday season.

In recent years, Jasen has also stepped in to help care for his nephews, Jesse Butler's sons. When their parents' demanding work schedules left them without consistent structure or schooling, Jasen took an active role in their daily lives. Jasen has dedicated unlimited hours each week to essentially home-school them and teach math, language, reading, science, and social studies. He also plays sports and coaches them in athletics, while introducing them to carpentry, gardening, art, and welding.

Jasen continues to express deep regret for the situation that has brought him before the Court. While he believed the underlying contracts themselves were legitimate, he acknowledges that he lied and that doing so was wrong. Jasen has consistently described caring for his family as central to his life. He is deeply affected by the extent to which his actions have caused hardship for the very people he has spent years trying to support.

Those who know Jasen describe a person who, when he commits to something, follows through with discipline and consistency – a pattern reflected throughout his life. That pattern is

31

reflected in both significant responsibilities and in the way he has conducted his personal life. He has expressed clearly to his family that he will not place himself in a position like this again.

Jasen has expressed that his focus is on returning to his family – to his father, Tara, his nephews, and the broader network of people who rely on him – and continuing to support them in the way he has throughout his life. He understands that rebuilding trust will take time, and he is committed to doing so through his actions, as he has consistently done in other areas of his life.

**B. Need for Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment**

Jasen is not seeking a sentence that is void of incarceration. He recognizes that his conduct warrants it. But any sentence should reflect the actual nature of the offense and not an exaggerated version of it. The Government repeatedly characterizes the payments as wholly illegitimate, but its position is inconsistent with the trial record and with the Government's own evidence. Jasen's offense is distinguishable from offenses in which false statements are made to obtain monies to which a defendant lacks even an arguable legal entitlement. A just sentence accounts for that reality.

**C. Need for Sentence to Afford Adequate Deterrence**

General deterrence does not require treating unlike cases as though they are the same. The lesson of this case is already clear: even where a defendant operates within a legitimate contractual framework, false statements will result in criminal liability and incarceration. That message is sufficiently powerful without imposing a sentence that ignores the distinguishing features of this case. As the letters to the Court reflect, Jasen is well known in his community and his efforts to improve the lives of others are both remarkable and without question. Any period of incarceration of Jasen will serve as a deterrent to others that even a person like Jasen is not above the law.

### D. Need to Protect the Public from Further Crimes of the Defendant

The Government portrays Jasen as someone who cannot be deterred and is likely to reoffend. That conclusion is overstated. Jasen has no prior felony convictions and is a zero-point offender. His life reflects stability, responsibility, and consistent support of others. To say that Jasen has learned his lesson from this case would be an understatement. For a person like Jasen with the track record of giving to others, the self-inflicted pain and anguish that he has experienced from letting others down has been excruciating. It is a pain that Jasen never wants to experience again. There is no indication that he poses a broader danger to the public.

### E. Need for Sentence to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

Jasen would seek a recommendation to the Bureau of Prisons that he be assigned to a camp at which Jasen can provide educational assistance to others.

### IV. GROUNDS FOR DOWNWARD VARIANCE

### A. The Guideline Calculation Overstates the Seriousness of the Offenses

The Sentencing Guidelines rely on the loss table in U.S.S.G. § 2B1.1 to determine the offense level in wire fraud cases. That framework, however, does not distinguish between materially different types of conduct. It treats alike (1) cases in which a defendant fabricates entitlement to money he was never owed and (2) cases in which a defendant uses improper means to obtain payment of monies tied to an underlying, legitimate claim of entitlement.

This case falls into the latter category. Mr. Butler's false statements did not create a right to payment where none existed; rather, they were used to facilitate payment within a contractual framework that, at minimum, provided an arguable basis for recovery. That distinction does not

33

excuse his conduct, but it bears directly on culpability. By failing to account for it, the Guidelines calculation overstates the seriousness of the offense.

The Government argues that contractual entitlement is irrelevant to the loss calculation. But that position conflates the mechanical rules governing "loss" under § 2B1.1 with the Court's broader obligation under 18 U.S.C. § 3553(a). Even if the Court determines that contract principles do not formally reduce loss for Guidelines purposes, they remain highly relevant to assessing culpability, proportionality, and what sentence is sufficient—but not greater than necessary.

A Guidelines range that treats this case the same as one involving wholly fabricated claims is, by definition, overstated. A downward variance is therefore necessary to ensure that the sentence imposed reflects the actual nature of the conduct at issue.

### B. Jasen Butler's Extraordinary Charitable and Philanthropic History

While Jasen Butler has been convicted of wire fraud, he has not lived the life of a fraudster. As reflected in the Presentence Report and the letters submitted to the Court (Appendix "D"), his life has been defined by a sustained commitment to helping others – not only through financial support, but through the consistent investment of his time, energy, and personal involvement.

Long before the conduct at issue in this case, Mr. Butler developed a pattern of showing up for people in meaningful ways: assisting family members during periods of instability, caring for loved ones facing medical challenges, mentoring and teaching younger relatives, and supporting friends and neighbors through difficult circumstances. These are not isolated acts of generosity, but a consistent way of living – one grounded in responsibility, reliability, and a genuine commitment to improving the lives of others.

Significantly, Mr. Butler's contributions cannot be measured merely in financial terms. They are reflected in hours spent helping others navigate hardship, in hands-on assistance when it

was needed most, and in a willingness to take on responsibility without recognition or reward. The letters before the Court describe someone who does not simply offer support, but who follows through quietly and consistently.

None of this diminishes the seriousness of his offense or eliminates the need for punishment. But it does meaningfully distinguish Mr. Butler from defendants whose conduct reflects only a pattern of self-interest or exploitation. His history demonstrates that the conduct before the Court is not representative of the life he has otherwise lived, and it is an appropriate consideration in determining a sentence that is sufficient, but not greater than necessary.

*See* **Appendix D – Letters of support**

**V. CONCLUSION**

Jasen Butler's recognition of his mistakes and wrong doings is sincere and genuine. Jasen's election to seek payment for monies he was contractually owed through false representations deserves punishment. However, the length of that punishment should recognize Jasen Butler's contractual entitlement to monies received from the Government. At the end of the day, Jasen Butler's case involves a good person making serious mistakes. These mistakes should not define Jasen Butler, who no doubt will continue being a positive difference maker in the lives of others.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 3, 2026, undersigned electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Florida by using the CM/ECF system. Undersigned certifies that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

| | |
|---|---|
| **GOLDBERGER WEISS, P.A.** | **BRUCE A. ZIMET, P.A.** |
| 1555 Palm Beach Lakes Boulevard | 1555 Palm Beach Lakes Boulevard |
| Suite 1400 | Suite 1400 |
| West Palm Beach, Florida 33401 | West Palm Beach, Florida 33401 |
| Tel: (561) 659-8300 | Tel: (561) 508-7741 |
| Fax: (561) 284-8938 | Fax: (954) 760-4421 |
| Email: jason@goldbergerweiss.com | Email: baz@bruceazimetlaw.com |
| | |
| /s/JASON S. WEISS, ESQ. | /s/ BRUCE A. ZIMET, ESQ. |
| Florida Bar No. 0096040 | Florida Bar No. 0225053 |
| Attorney for the Defendant | Attorney for the Defendant |

36